UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

WILLARD RICHARD STROUD, JR.,

Plaintiff,

v.

SHERIFF WILLIAM D. GORE, et al.,

Defendants.

Case No.: 18-CV-515 JLS (MDD)

**ORDER (1) GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT; AND (2) OVERRULING AS MOOT DEFENDANTS' EVIDENTIARY OBJECTIONS**

(ECF Nos. 86, 103-1)

Presently before the Court are Defendants Sergeant Paul Michalke, Detective Benjamin Shea, and Sergeant Jesus Lizarraga's (collectively, the "Deputy Defendants") Motion for Summary Judgment, or in the Alternative, Partial Summary Judgment ("MSJ," ECF No. 86); Plaintiff Willard Richard Stroud, Jr.'s Opposition thereto ("Opp'n," ECF No. 101); and the Deputy Defendants' Reply in support thereof ("Reply," ECF No. 103). Also before the Court are the Deputy Defendants' Objections to Plaintiff's Exhibits in Support of Opposition ("Evid. Objs.," ECF No. 103-1). The Court vacated the hearing on the MSJ and took it under submission for decision on the papers without oral argument pursuant to Civil Local Rule 7.1(d)(1). *See* ECF No. 104. Having considered the Parties' arguments,

the evidence, and the law, the Court **GRANTS IN PART AND DENIES IN PART** the Deputy Defendants' MSJ and **OVERRULES AS MOOT** the Deputy Defendants' Evidentiary Objections.

## BACKGROUND[1]

### I. Factual Background

On the evening of March 12, 2016, at approximately 8:30 p.m., Plaintiff drove to the George Bailey Detention Facility ("GBDF"), located on Alta Road in San Diego, California, to visit his incarcerated son. Pl.'s Statement of Genuine Issues of Material Fact in Dispute ("SGIMFID") ¶ 1.[2] During his deposition, Plaintiff stated that he had consumed no alcohol or other drugs prior to arriving at GBDF on the evening in question. Transcript of Feb. 19, 2021 Videotaped Deposition of William [sic] Richard Stroud, Jr. ("Pl.'s Depo. Tr.") 55:23–56:7.[3] Plaintiff had been to GBDF many times before—"upwards of a hundred times"—to visit his son, at different hours of the day. SGIMFID ¶ 2; Pl.'s Depo. Tr. 57:11–13, 58:23–59:23. Prior to each visit, Plaintiff would drive up Alta Road, park in the parking lot, walk into the lobby, and go through a metal detector. SGIMFID ¶ 3.

Signs on Alta Road inform visitors that they and their vehicles are subject to search prior to entering GBDF. *Id.* ¶ 4. The English portion of the signs reads:

---

[1] The Parties have different views of many of the relevant facts. Unless otherwise indicated, the facts recited in this Section are undisputed.

[2] The Deputy Defendants object to and move to strike certain paragraphs in Plaintiff's SGIMFID "on the grounds that they are non-responsive, contain argument, and go far beyond the scope of the facts listed in the Deputy Defendants' Separate Statement and, consequently, are a mechanism Plaintiff is using the [sic] circumvent the page limit for the briefing." Evid. Objs. at 5. The Court **OVERRULES AS MOOT** the Deputy Defendants' objections to paragraphs 6, 8, 13, 17, 18, 20 to 29, 31, 32, 35, and 38, given that the Court did not rely on those paragraphs in ruling on their Motion. As to paragraph 5, the Court has relied on that paragraph only to the extent that Plaintiff admits that paragraph 5 of the Deputy Defendants' Statement of Undisputed Facts is undisputed in relevant part. Accordingly, the Court also **OVERRULES AS MOOT** the Deputy Defendants' objections to paragraph 5 of Plaintiff's SGIMFID.

[3] Both the Deputy Defendants and Plaintiff submitted portions of Plaintiff's February 19, 2021 Deposition Transcript as evidence. *See* Defs.' Notice of Lodgment in Support of MSJ ("Defs.' NOL," ECF No. 86-6) Ex. A; Pl.'s Notice of Lodgment in Opposition to MSJ ("Pl.'s NOL," ECF No. 101) Ex. J. For ease of reference, the Court cites generally to "Plaintiff's Deposition Transcript" throughout this Order.

PARKING LOT

YOU ARE ENTERING
EAST MESA DETENTION COMPLEX.
BRINGING INTO OR THE POSSESSION OF
ANY WEAPON, NARCOTIC, DRUG OR ALCOHOLIC
BEVERAGE WITHIN THE BOUNDARIES OF THIS
FACILITY IS PROHIBITED BY LAW. ALL PERSONS,
PROPERTY AND VEHICLES ARE SUBJECT TO SEARCH.
PENAL CODE SECTIONS 4573.5, 4573.6 AND 4574.

Defs.' NOL Ex. B (emphasis in original). Plaintiff claims that he was unaware of what the signs stated. Pl.'s Depo. Tr. 57:25–58:22, 60:1–6. Signs in the parking lot also inform visitors that alcohol is not permitted on the premises. SGIMFID ¶ 4. Parking lot signs state in red lettering: "ALL PERSONS, PROPERTY AND VEHICLES ARE SUBJECT TO SEARCH." Defs.' NOL Ex. C (emphasis in original).

The Detentions Investigation Unit was conducting an enforcement operation in the GBDF parking lot between 3:00 and 9:00 p.m. on the day in question, seeking to contact as many visitors as possible before they entered the lobby to ensure they were not in possession of contraband, such as drugs or weapons. SGIMFID ¶ 5. GBDF inmate workers have access to the visitor lobby and parking lot, and the visitor lobby has bathrooms that visitors can use prior to checking in for visits and going through metal detectors. *Id.* ¶ 7; *see also* Defs.' NOL Ex. E. Deputies believed that prison visitors were hiding contraband in the parking lot or in the visitor lobby bathrooms for inmate workers to smuggle in. SGIMFID ¶ 7. During the enforcement operation, deputies were also checking that visitors did not have prior prison sentences that would preclude their visit pursuant to California Penal Code section 4571. *Id.* ¶ 8.

The Deputy Defendants were among the team that was conducting the enforcement operation. *Id.* ¶ 9. Sergeant Michalke was supervising the operation. Declaration of Defendant Sergeant Paul Michalke ("Michalke Decl.," ECF No. 86-2) ¶ 4. There were six to eight deputies working on the operation. *Id.* Sergeant Michalke has conducted six such enforcement operations. *Id.* ¶ 6. Given the signage on Alta Road and in the parking lot,

"[m]ost visitors to the facility are not surprised when we tell them that they will be searched prior to entering the facility." *Id.*

Visitors to GBDF park their cars under solar panels. SGIMFID ¶ 10. There are lights in the parking lot, *id.*, although the Parties dispute the brightness thereof. Plaintiff claims that when he arrived at GBDF it was dark outside and the parking lot was lit with "some amber lights" that are "not bright." Pl.'s Depo. Tr. 73:17–19; SGIMFID ¶ 10. The Deputy Defendants claim "it was becoming dark" when Plaintiff arrived but that the parking lot is "well lit." *See* Michalke Decl. ¶ 7; *see also* Defs.' NOL Ex. F. About halfway between Plaintiff's car and the lobby, several persons wearing tactical uniforms that identified them as being with the Sheriff's Department approached Plaintiff. Defs.' Statement of Undisputed Facts ("SUF," ECF No. 86-7) ¶ 11; Opp'n at 5 (noting that Plaintiff was stopped by deputies who "were wearing police uniforms that depicted the Sheriff's Department" "in the middle of the parking lot"); SGIMFID ¶ 15 (acknowledging that "Deputy Defendants approached and met Plaintiff halfway between his car and the facility lobby"); Pl.'s Depo. Tr. 67:1–3. Plaintiff claims the Deputy Defendants were part of a group of six to eight deputies. Pl.'s NOL Ex. C (Declaration of Plaintiff Willard Richard Stroud Jr. ("Pl. Decl.")) ¶ 5.[4] The Deputy Defendants claim that only Deputy Lizarraga and Sergeant Michalke approached Plaintiff as a team. Michalke Decl. ¶ 7. Deputy Lizarraga asked if Plaintiff had identification, and Plaintiff gave Deputy Lizarraga his driver's license. SGIMFID ¶ 12. The group of deputies asked Plaintiff who he was visiting and whether he'd ever been arrested. *Id.* ¶ 14. "Plaintiff responded that he was visiting a 'friend' and that he had previously been arrested for 'street crimes' like 'gang banging.'" *Id.*

---

[4] The Deputy Defendants object to certain evidence submitted by Plaintiff in support of his Opposition, including portions of Plaintiff's Declaration. *See* Evid. Objs. at 2–4. The Court **OVERRULES AS MOOT** the Deputy Defendants' objections to Plaintiff's Exhibits A, B, I, and K, given that the Court has not relied on those exhibits in ruling on the Deputy Defendants' MSJ. The Court further **OVERRULES AS MOOT** the Deputy Defendants' objections to paragraphs 3, 4, 6 (in part), and 18 to 21 of Plaintiff's Declaration for the same reason.

What happened next is heavily disputed. According to Plaintiff, he had his cell phone in his right hand. Pl.'s Depo. Tr. 72:21–22. The Deputy Defendants told Plaintiff that they were going to search him and his car, but Plaintiff declined to be searched and indicated that he did not want to proceed with his visit. Pl.'s Depo. Tr. 68:21–23; Pl. Decl. ¶¶ 5–6. Deputy Lizarraga told Plaintiff that he "was on their property" and that they were going to search Plaintiff "with or without [his] permission." Pl. Decl. ¶ 6. "[W]ithin 3 seconds Deputy Defendants went hands on." *Id.* Plaintiff claims that the Deputy Defendants "violently and aggressively slammed [him] against the rear of a parked vehicle" and "twisted and tweaked [his wrists] behind [his] back." *Id.* ¶ 8. When Plaintiff "was slammed against the car," he said, "Please stop, why you doing this, stop." Pl.'s Depo. Tr. 82:13–17. "[Deputy] Lizarraga [w]rapped his arm around [Plaintiff's] neck and shoulders while [Deputy] Shea twisted [Plaintiff's] arms and bent [his] wrist back in awkward positions." Pl. Decl. ¶ 8. Plaintiff "felt the force of several people forcing [his] body against the parked car." *Id.* Although Plaintiff may have tensed up at this point because "they were grabbing and pulling and choking on [him], it's a natural instinct for a person's body," he "did not attempt to flee." Pl.'s Depo. Tr. 79:17–19.

Then, one deputy "grabbed [Plaintiff's] head and pulled [him] down to the ground in an aggressive manner." Pl. Decl. ¶ 8. When he was on the ground, Plaintiff said, "Stop. It hurts. Why are you doing this? Stop." Pl.'s Depo. Tr. 82:18–21. The deputies told Plaintiff to "[j]ust stop resisting." *Id.* 82:22–23. However, Plaintiff claims his hands "were still always behind me," and he "never had [his] hands flailing or anything, none of that." *Id.* 82:5–6. Plaintiff was being "chok[ed]" by the deputies. *Id.* 79:1–14. Then, one of the deputies tightly handcuffed Plaintiff and "wrenched them down." *Id.* 83:22–24. Sometime during the confrontation, Plaintiff noticed his phone was no longer in his hand. *Id.* 79:1–3. But, after Plaintiff was handcuffed, he did not see his cell phone on the ground. *Id.* 96:1–3. The deputies stood Plaintiff up and Plaintiff said something along the lines of "My wrist is broken." *Id.* 84:20–25. The deputies began to search Plaintiff's pockets, but Plaintiff was crying, so they asked if he needed medical treatment. *Id.* 84:3–5. Plaintiff

replied that he did need medical treatment, and so the deputies called the paramedics. *Id.* 84:5–12. The paramedics arrived less than five minutes later. *Id.* 86:4–7. The paramedic confirmed that Plaintiff had no broken bones. *Id.* 86:8–13. Plaintiff said that his handcuffs were too tight, said that he was in pain, and requested that his handcuffs be loosened. *Id.* 92:1–16. Plaintiff declares that he asked the Deputy Defendants to please loosen the handcuffs, but they failed to do so. Pl. Decl. ¶ 9.

According to the Deputy Defendants, when they approached and began interacting with Plaintiff, they noticed that Plaintiff's eyes were red and watery and his speech was slurred, which made the Deputy Defendants think that he may have been under the influence of alcohol or drugs and therefore a danger to a secure facility like GBDF. SUF ¶ 13; Declaration of Defendant Jesus Lizarraga ("Lizarraga Decl.," ECF No. 86-4) ¶ 9. Accordingly, Deputy Lizarraga informed Plaintiff that he and his vehicle would be searched. Lizarraga Decl. ¶ 9. Plaintiff refused to be searched and began walking away toward the visitor lobby as though he still intended to visit his son. SUF ¶¶ 15, 20. Plaintiff did not indicate that he wanted to return to his vehicle or leave the jail grounds. Declaration of Defendant Benjamin Shea ("Shea Decl.," ECF No. 86-3) ¶ 8. Given that "most visitors willingly allow [deputies] to conduct a search and search their vehicle," the Deputy Defendants viewed Plaintiff's conduct as "out of the ordinary" and an indicator "that Mr. Stroud could have been hiding contraband." Michalke Decl. ¶ 8. Deputy Shea declares that Plaintiff was the only visitor who was not "cooperative" and who did not "allow[ the deputies] to conduct searches of their person, belongings, and vehicles." Shea Decl. ¶ 4.

Deputy Shea approached Plaintiff, Sergeant Michalke, and Deputy Lizarraga. *Id.* ¶ 5. As he approached, he, too, noticed that Plaintiff's eyes were red and watery and his speech was slow and slurred, making Deputy Shea believe Plaintiff was intoxicated. *Id.* ¶¶ 5–6. Deputy Michalke grabbed Plaintiff's right arm and Deputy Lizarraga grabbed Plaintiff's left arm so they could stop Plaintiff from entering the lobby and instead escort Plaintiff to a nearby vehicle to complete their investigation, but Plaintiff tensed his arms and balled up one of his fists. SUF ¶¶ 18–19. Deputy Shea took over for Sergeant Michalke

on Plaintiff's right side "[w]ithin seconds." SUF ¶ 20; Michalke Decl. ¶ 9. Meanwhile, Sergeant Michalke stood nearby and directed any visitors away from the area. Michalke Decl. ¶ 11.

According to the Deputy Defendants, Plaintiff continued to tense his arms and pull them to the middle of his body while Deputies Shea and Lizarraga escorted him to the nearby vehicle. SUF ¶ 21. Because Plaintiff was actively resisting the search and had not been patted down for weapons or contraband, the deputies thought it necessary to handcuff Plaintiff. *Id.* ¶ 22. Once at the vehicle, Plaintiff refused to allow Deputy Lizarraga to handcuff him. Michalke Decl. ¶ 10. The deputies repeatedly told Plaintiff to relax his arms, but he continued to try to pull his arms away instead. SUF ¶¶ 23–24. Plaintiff pulled his left arm away from Deputy Lizarraga and put it near his waistband, making the deputies think he may have had a weapon. *Id.* ¶ 25. Deputy Shea had to put Plaintiff's hands into a rear wristlock position because he was having difficulty controlling Plaintiff's right side. *Id.* Deputy Shea told Plaintiff to stop resisting, but Plaintiff ignored his instructions. Shea Decl. ¶ 14. Deputy Lizarraga repeatedly asked Plaintiff to relax his arms, but Plaintiff did not comply. Lizarraga Decl. ¶ 12. Given Plaintiff's continued resistance, Deputy Shea then pushed Plaintiff's head down to bring Plaintiff to the ground to handcuff him. SUF ¶ 26. Deputy Lizarraga assisted in bringing Plaintiff to the ground. *Id.* While laying prone on the ground, Plaintiff continued to struggle, so Deputy Lizarraga placed his knee on Plaintiff's back and Deputy Shea used his arms to hold Plaintiff down. *Id.* Deputy Lizarraga handcuffed and searched Plaintiff and found no contraband or weapons. *Id.* Deputy Lizarraga denies "wrenching down" the handcuffs or applying them too tightly. Lizarraga Decl. ¶ 14. The entire confrontation lasted less than a minute. SUF ¶ 27.

Plaintiff claims to have told the Deputy Defendants and paramedics generally that his handcuffs were overly tight. Pl.'s Depo. Tr. 92:1–16 ("I didn't tell anyone specifically. I told the group that my arms hurt and that -- please take the handcuffs, loosen them up or something, but then that was only when the paramedics said that -- to please loosen them . . . . And I just said, Just loosen them up, please, please, please, please. It's very tight and

I'm in a lot of pain. But they didn't care . . . . I just said it broadly. I didn't pick out any specific officer. I just said it aloud."). Each Deputy Defendant claims that Plaintiff never stated that his handcuffs were too tight or requested that they be loosened. *See* Michalke Decl. ¶ 12; Shea Decl. ¶ 20; Lizarraga Decl. ¶ 14. Plaintiff did complain that his wrist was broken, and Deputy Shea requested medical assistance. Shea Decl. ¶ 19. The medical unit determined that Plaintiff did not need to be transported to the hospital for treatment and that his wrist was uninjured. *Id.*; Lizarraga Decl. ¶ 15.

It is undisputed that Plaintiff's car was searched after the incident. SGIMFID ¶ 15. Plaintiff claims multiple officers conducted the search, but he does not know which specific officers did so. Pl.'s Depo. Tr. 105:2–21. According to the Deputy Defendants, Deputy Shea was not involved in the search or the decision to do so. Shea Decl. ¶ 22. Nor was Sergeant Michalke. Michalke Decl. ¶ 13. However, after the search, Deputy Shea did observe a six-pack of beer with two of the beers missing in Plaintiff's car. Shea Decl. ¶ 23. Deputy Kirsten Racine, a K-9 handler who was participating in the operation and observed the entire incident, claims to have seen a container of alcohol behind the driver's seat and other alcoholic beverage containers in the trunk, including the six-pack of beer. Declaration of Kirsten Racine ("Racine Decl.," ECF No.86-5) ¶ 11. Plaintiff does not dispute that there was alcohol in his trunk. Pl.'s Depo. Tr. 56:23–25. Plaintiff did not see any of the Deputy Defendants take his phone either during or after the incident. SGIMFID ¶ 34; *see also* Pl.'s Depo. Tr. 120:19–21. Deputy Shea does not recall seeing a phone during the confrontation. Shea Decl. ¶ 21. Nor does Deputy Lizarraga. Lizarraga Decl. ¶ 18.

It is undisputed that Plaintiff was thereafter charged with resisting or obstructing an officer in violation of California Penal Code section 148(a)(1) and public intoxication in violation of California Penal Code section 647(f). SGIMFID ¶ 30; *see also* Defs.' NOL Ex. H. Plaintiff claims to have asked the Deputy Defendants to administer a field sobriety test or a "toxicology examination." Pl. Decl. ¶ 10. The Deputy Defendants did not conduct any sobriety tests of Plaintiff, however. *See id.*; *see also* Lizarraga Decl. ¶ 17. Plaintiff

was transported to and booked into San Diego Central Jail ("SDCJ") and released the next morning. SGIMFID ¶ 33. Plaintiff claims he also "asked the people that booked [him]" to "test [him]" for intoxicating substances, but they refused. Pl.'s Depo. Tr. 97:5–17.

After being released from SDCJ, Plaintiff returned to GBDF to search for his cell phone. SGIMFID ¶ 37. Plaintiff looked for his cell phone in the parking lot and asked a deputy to check the lost and found, but his phone could not be found. *Id.* Plaintiff was given a phone number to call to help locate his phone. *Id.* A few days later Plaintiff spoke with Sergeant Michalke, who claims he had picked up a phone after the confrontation and given it to another deputy to whom he thought the phone belonged. *Id.* ¶ 38. Plaintiff declares that Sergeant Michalke told Plaintiff "that he had had the phone but did not know where it had gone." Pl. Decl. ¶ 15. Plaintiff also declares that, during the phone call, Sergeant Michalke told him "that he was sorry about what happened during the incident at GBDF and that he *did not* feel that [Plaintiff] was intoxicated on drugs/alcohol but only agreed to charge and arrest [Plaintiff] because the other deputies wanted to take [him] to jail." *Id.* (emphasis in original). Thereafter, Sergeant Michalke made further inquiries concerning Plaintiff's phone but was unable to locate it and informed Plaintiff of that fact by phone. Michalke Decl. ¶¶ 15–16. Plaintiff ultimately filed a claim with the County of San Diego regarding his missing phone. SGIMFID ¶ 39. However, Plaintiff's claim was denied because the phone service was not in his name and his claim was untimely. Pl.'s Depo. Tr. 117:1–25.

## II. Procedural Background

On March 9, 2018, Plaintiff filed this action, in pro se, pursuant to 42 U.S.C. § 1983 against the County of San Diego (the "County"), Sheriff William D. Gore, Detective Lizarraga, Sergeant Michalke, Detective Shea, and the City of San Diego Paramedics Services. *See* ECF No. 1. Plaintiff was granted leave to proceed *in forma pauperis*, *see* ECF No. 4, and the United States Marshals Service served Sheriff Gore and Sergeant Michalke on April 27, 2018. *See* ECF Nos. 6, 10. The Sheriff's Office refused to accept / / /

service on behalf of Detectives Lizarraga and Shea and the City of San Diego Paramedics Services.  *See* ECF Nos. 7–9.

Defendants filed a motion to dismiss Plaintiff's original complaint on May 18, 2018.  *See* ECF No. 11.  The Court granted Plaintiff leave to file a First Amended Complaint ("FAC"), *see* ECF No. 14, in which Plaintiff added as defendants Detective M. Snelling, Deputy K. Racine, and Paramedic E. Lancaster.  *See generally* ECF No. 15.  Consequently, the Court denied as moot the pending motion to dismiss, *see* ECF No. 16, following which Defendants Sheriff Gore and Sergeant Michalke filed a motion to dismiss Plaintiff's FAC.  *See* ECF No. 17.  The Court granted their motion, dismissing Plaintiff's FAC without prejudice.  *See generally* ECF No. 30.

On December 26, 2018, Plaintiff filed a Second Amended Complaint ("SAC"), which dropped as Defendants Paramedic E. Lancaster, Sheriff Gore, Deputy Racine, and Detective Snelling but added unnamed Doe Defendants 1–25.  *See generally* ECF No. 32. On January 9, 2019, Sergeant Michalke filed a Motion to Dismiss the SAC, *see generally* ECF No. 32, which was joined by the County on February 1, 2019, *see generally* ECF No. 35, and Defendants Lizarraga and Shea on April 9, 2019, *see generally* ECF No. 44.  On April 12, 2019, Defendants Racine and Snelling filed a second Motion to Dismiss.  *See generally* ECF No. 46.  The Court granted in part and denied in part the Motions, dismissing without prejudice Plaintiff's state law causes of action and all causes of action against Defendants Racine and Snelling.  *See* ECF No. 62.

On September 16, 2019, Plaintiff filed the operative Third Amended Complaint ("TAC"), again adding as Defendants Deputy Racine and Detective Snelling.  *See generally* ECF No. 64 ("TAC").  On September 27, 2019, Defendants filed a Motion to Dismiss the TAC.  *See* ECF No. 64.  On August 5, 2020, the Court granted in part and denied in part the Motion, dismissing with prejudice Plaintiff's third claim and all of his claims against Detective Snelling and Deputy Racine and dismissing without prejudice all of Plaintiff's claims against the County.  *See generally* ECF No. 71.  The Court also dismissed as duplicative Plaintiff's fourth claim to the extent it was premised on

unreasonable seizure of his person.  *See id.*  The Court granted Plaintiff leave to amend, but Plaintiff declined to do so.  *See id.*  Accordingly, the Deputy Defendants are the only remaining defendants in this action, and only Plaintiffs first, second, fourth, and fifth claims remain.  The Deputy Defendants thereafter answered the TAC.  *See* ECF No. 73.

The Deputy Defendants filed the instant Motion on May 19, 2021.  *See* ECF No. 86.  Plaintiff failed to timely oppose, *see* ECF No. 93, but filed a late Opposition, *see* ECF No. 101.  The Deputy Defendants filed their Reply, *see* ECF No. 103, and the Court accepted the late-filed Opposition and the Reply and took the matter under submission, *see* ECF No. 104.

## LEGAL STANDARDS

### I.   Summary Judgment

Under Federal Rule of Civil Procedure 56(a), a party may move for summary judgment as to a claim or defense or part of a claim or defense.  Summary judgment is appropriate where the Court is satisfied that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Material facts are those that may affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine dispute of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  When the Court considers the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.

The initial burden of establishing the absence of a genuine issue of material fact falls on the moving party.  *Celotex*, 477 U.S. at 323.  The moving party may meet this burden by identifying the "portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,'" that show an absence of dispute regarding a material fact.  *Id.*  Once the moving party satisfies this initial burden, the nonmoving party must identify specific facts showing that there is a genuine dispute for trial.  *Id.* at 324.  This requires "more than simply show[ing] that there is some metaphysical

doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, to survive summary judgment, the nonmoving party must "by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts'" that would allow a reasonable fact finder to return a verdict for the non-moving party. *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 248. The non-moving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegations or denials of his pleadings." *Anderson*, 477 U.S. at 256.

**II. 42 U.S.C. § 1983**

Section 1983 of Title 42 of the United States Code "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393–94 (1989) (internal quotation marks and citations omitted). To state a claim under section 1983, a plaintiff must allege both that (1) the defendant was acting under color of state law at the time the complained of act was committed,[5] and (2) the defendant's conduct deprived the plaintiff of rights, privileges, or immunities secured by the Constitution or laws of the United States. *See Jensen v. City of Oxnard*, 145 F.3d 1078, 1082 (9th Cir. 1998). Under section 1983, a defendant deprives another of a constitutional right if the defendant "does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that *causes* the deprivation of which [the plaintiff complains]." *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988) (emphasis and alterations in original) (quoting *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978)). "The inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation." *Id.*

/ / /

[5] "[G]enerally, a public employee acts under color of state law while engaged in his official capacity or while exercising his responsibilities pursuant to state law." *West v. Atkins*, 487 U.S. 42, 50 (1988). The Deputy Defendants do not contest that they were acting under color of state law at the time the complained of acts were committed. *See generally* MSJ.

### III.    Qualified Immunity

"In determining whether an officer is entitled to qualified immunity, [courts] consider (1) whether there has been a violation of a constitutional right, and (2) whether that right was clearly established at the time of the officer's alleged misconduct." *Lal v. California*, 746 F.3d 1112, 1116 (9th Cir. 2014) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).  Courts may "exercise sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.  If either prong is dispositive, the court need not analyze the other prong. *See id.* at 236–37.

A right is clearly established if the law was "sufficiently clear that every reasonable official would understand that what he is doing" is unlawful. *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)) (internal quotation marks omitted).  "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741.  "Except in the rare case of an 'obvious' instance of constitutional misconduct," a plaintiff must identify a controlling case existing at the time of the incident where an officer acting under similar circumstances as defendants was held to have violated the constitutional right at issue. *See Sharp v. Cty. of Orange*, 871 F.3d 901, 911 (9th Cir. 2017) (quoting *White v. Pauly*, 137 S. Ct. 548, 552 (2017)).  The Ninth Circuit has held that "the 'obviousness principle, an exception to the specific-case requirement, is especially problematic in the Fourth-Amendment context,'" and "thus has 'real limits when it comes to the Fourth Amendment.'" *O'Doan v. Sanford*, 991 F.3d 1027, 1044 (9th Cir. 2021) (quoting *Sharp*, 871 F.3d at 912).

## ANALYSIS

As modified by the Court's August 5, 2020 Order, Plaintiff's TAC asserts the following claims against the Deputy Defendants pursuant to 42 U.S.C. § 1983: (1) unreasonable seizure of person/excessive force in violation of the Fourth Amendment; (2) retaliation in violation of the First Amendment; (3) unreasonable seizure of phone in

violation of the Fourth Amendment; and (4) unreasonable search of person, belongings, and vehicle in violation of the Fourth Amendment. *See generally* TAC; *see also* ECF No. 71. The Deputy Defendants argue that Plaintiff's claims fail as a matter of law and, alternatively, that the Deputy Defendants are entitled to qualified immunity. *See* MSJ at 2.

## I. Unreasonable Seizure of Phone

Tangible property is "seized" within the meaning of the Fourth Amendment "when there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). The Fourth Amendment does not protect against all seizures, but only those that are unreasonable. *Florida v. Jimeno*, 500 U.S. 248, 250 (1991). Further, "the Fourth Amendment is only implicated by intentional conduct." *Nguyen v. Cty. of San Bernardino*, No. 5:20-CV-00880-SVW-SP, 2021 WL 4551172, at *6 (C.D. Cal. Aug. 18, 2021) (citing *Dimmig v. Cty. of Pima*, 569 F. App'x 540 (9th Cir. 2014); *Brower v. Cty. of Inyo*, 489 U.S. 593, 597 (1989); *Daniels v. Williams*, 474 U.S. 327, 329–30 (1986)).

Plaintiff contends, without much elaboration, "that his phone was seized, never accounted for and never returned." TAC ¶ 126. He claims that all the Deputy Defendants "confiscate[ed] his cell phone," and that Sergeant Michalke "has admitted to having possession of Plaintiff's cell phone." Opp'n at 2. Plaintiff argues that the Deputy Defendants' contention that "Plaintiff's cell phone was 'misplaced' is an insufficient justification." *Id.* at 12. The Deputy Defendants, however, argue that there is a lack of evidence that any of them intentionally interfered with Plaintiff's phone, and the lack of an intentional act is fatal to Plaintiff's claim. *See* MSJ at 20.

Viewing the evidence in the light most favorable to Plaintiff and construing all plausible inferences in his favor, Plaintiff does not contend that he saw any of the Deputy Defendants take his phone. SGIMFID ¶ 34. Both Deputies Shea and Lizarraga each declare they never saw Plaintiff's phone, and Sergeant Michalke declares under penalty of perjury that Plaintiff's phone was not seized during the incident. Michalke Decl. ¶ 14;

Shea Decl. ¶ 21; Lizarraga Decl. ¶ 18. Ultimately, the Deputy Defendants have come forward with evidence that Plaintiff's phone was not intentionally confiscated during their confrontation with Plaintiff. Plaintiff has failed to come forward with concrete evidence to the contrary. Thus, at most, the evidence suggests that Sergeant Michalke may have found Plaintiff's phone and believed that it belonged to another deputy and therefore given the phone to someone else. These actions do not rise to the intentional seizure necessary to state a claim. *See Nguyen*, 2021 WL 4551172, at *6 (holding, where officer defendant unintentionally retained the plaintiff's property, that, "because the Fourth Amendment is only implicated by intentional conduct, the seizure of Plaintiff's phone . . . was not unlawful") (citations omitted). Accordingly, Plaintiff's claim fails as a matter of law, and the Court **GRANTS** the Deputy Defendants' Motion as to Plaintiff's claim for unreasonable seizure of his phone.

## II. Unreasonable Search of Person, Belongings, and Vehicle

The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. However, "[t]he [Supreme] Court has also sanctioned several general search regimes that are free from the usual warrant-and-probable cause requirements." *United States v. Kincade*, 379 F.3d 813, 822 (9th Cir. 2004).

"The majority of courts have held that the prison visitation context constitutes one of these exceptions." *Loftis v. Ramos*, 491 F. Supp. 3d 753, 767 (S.D. Cal. 2019). Indeed, concerning prison visitors, the Ninth Circuit has stated:

> As we have recognized, "[p]rison officials . . . have a strong interest in preventing visitors from smuggling drugs into the prison." Concerns about smuggling drugs and other contraband, such as weapons, into the facility may justify a variety of security screening measures. The nature of permissible screening measures will vary depending on the nature of the threat. "Courts must consider the scope of the particular intrusion, the manner in

> which it is conducted, the justification for initiating it, and the place in which it is conducted." While "some quantum of individualized suspicion is usually a prerequisite to a constitutional search or seizure," the unique context of the prison facility does not always require individualized suspicion. Some searches of visitors to "sensitive facilities," like courthouses or prisons, require no individualized suspicion provided that the searches are both limited and necessary.

*Cates v. Stroud*, 976 F.3d 972, 979 (9th Cir. 2020) (citing *Mendoza v. Blodgett*, 960 F.2d 1425, 1433 (9th Cir. 1992); *Bell v. Wolfish*, 441 U.S. 520, 559 (1979); *United States v. Martinez-Fuerte*, 428 U.S. 543, 560 (1976); *McMorris v. Alioto*, 567 F.2d 897, 899 (9th Cir. 1978)).

The Deputy Defendants contend, and Plaintiff does not dispute, that the Deputy Defendants' search of Plaintiff's person and his car were conducted pursuant to the administrative search exception. *See* MSJ at 8–15; Reply at 1 (noting that Plaintiff does not oppose the argument that the administrative search exception applies). The Court agrees, on the evidence presented, that the Deputy Defendants' search operation of prison visitors and their belongings on prison grounds was an administrative search.

Nonetheless, even "an administrative search must meet the Fourth Amendment's standard of reasonableness." *Klarfeld v. United States*, 944 F.2d 583, 586 (9th Cir. 1991) (citation omitted). Reasonableness is determined by balancing the intrusion of the search on the individual's Fourth Amendment interests against the promotion of legitimate government interests. *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 619 (1989). In assessing reasonableness, "[c]ourts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Bell*, 441 U.S. at 559 (citations omitted). Although "governmental entities are not required to use the least intrusive means possible in conducting administrative searches," *United States v. Kerr*, 300 F. Supp. 3d 1226, 1231 (E.D. Wash. 2018), the search must be "clearly necessary to secure a vital governmental interest, such as protecting sensitive facilities from a real danger of violence," and "no more intrusive than necessary

to protect against the danger to be avoided." *McMorris*, 567 F.2d at 899. Importantly, the Ninth Circuit has cautioned that, "[l]ike prisoners, prison visitors retain only those rights that are consistent with the prison's significant and legitimate security interests. But visitors' privacy interests, and their threats to prison security, are distinct from those of inmates and detainees." *Cates*, 976 F.3d at 979 (citations omitted).

Further, while the Ninth Circuit previously held that the constitutionality of administrative searches was dependent on consent, the Ninth Circuit subsequently recognized that "the Supreme Court has held that the constitutionality of administrative searches is not dependent upon consent." *United States v. Aukai*, 497 F.3d 955, 959 (9th Cir. 2007) (en banc) (citing *United States v. Biswell*, 406 U.S. 311 (1972)). In *Aukai*, the Ninth Circuit, sitting en banc, overruled precedent predicating the reasonableness of airport screening searches upon consent. *Id.* at 962. Subsequently, some district courts within the Ninth Circuit have extended that reasoning to other administrative searches. *See, e.g.*, *Kerr*, 300 F. Supp. 3d at 1232 (finding no consent required for administrative search to enter Social Security Administration office located in business park).

With these principles in mind, the Court now turns to whether the Deputy Defendants' search of Plaintiff's vehicle and person were reasonable.[6]

***A. Search of Plaintiff's Vehicle***

Plaintiff contends that the Deputy Defendants' search of his car was unreasonable, presumably because, according to Plaintiff, it was conducted without Plaintiff's consent after he expressed an interest in leaving rather than submitting to a search. *See, e.g.*, Pl. Decl. ¶ 5 ("I was told that my visit was contingent upon my consenting and complying by allowing +the deputies to search me and my vehicle. I informed the officers that I did not wish to forfeit my constitutional rights in leu [sic] of a visit and that I would rather just go

---

[6] Plaintiff additionally challenges the search of his "belongings," but it appears that the only belongings searched were Plaintiff's vehicle and its contents and the contents of Plaintiff's pockets. *See* Pl.'s Depo. Tr. 84:3–85:22, 104:7–105:21. Accordingly, the Court finds that the search of Plaintiff's belongings is subsumed within the searches of his car and his person and proceeds with its analysis accordingly.

home and not continue with the scheduled visit."); Pl.'s Depo. Tr. 104:7–105:21; Opp'n at 2, 3, 10.

The Deputy Defendants assert that neither Sergeant Michalke nor Deputy Shea participated in the decision to search Plaintiff's car or in the search itself, and accordingly they are entitled to judgment on this claim. MSJ at 13 (citing SUF ¶ 29); *see also* Michalke Decl. ¶ 13; Shea Decl. ¶ 22. The Deputy Defendants further contend that there was probable cause to search Plaintiff's vehicle because there were indications Plaintiff was intoxicated. MSJ at 13 (citing SUF ¶ 13). However, the Deputy Defendants also claim probable cause was not necessary to search Plaintiff's car given that it was located on prison grounds, inmate workers had access to the parking lot where the vehicle was located, and signs clearly warned that visitors' vehicles are subject to search. *See id.* at 13–15.

The Ninth Circuit has recognized that "'[p]rison officials . . . have a strong interest in preventing visitors from smuggling drugs into the prison.'" *Cates*, 976 F.3d at 979 (quoting *Mendoza*, 960 F.2d at 1433). Thus, "[c]oncerns about smuggling drugs and other contraband, such as weapons, into the facility may justify a variety of security screening measures." *Id.*; *see also United States v. Fowlkes*, 804 F.3d 954, 961 (9th Cir. 2015) (acknowledging that "[t]he government has a strong interest in preventing contraband from entering its prisons and jails") (citation omitted).

In *Cates*, while assessing the constitutionality of an unconsented strip search of a prison visitor who had expressed a preference to leave the facility rather than be searched, the Ninth Circuit distinguished out-of-circuit cases finding reasonable unconsented searches of the cars of prison visitors or employees where prison inmates have access to the parking lot, even when the car's owner had expressed a preference to leave rather than proceed with the search. *See* 976 F.3d at 983–84 (citing *United States v. Prevo*, 435 F.3d 1343, 1348–49 (11th Cir. 2006); *Neumeyer v. Beard*, 421 F.3d 210, 211 (3d Cir. 2005); *McDonell v. Hunter*, 809 F.2d 1302, 1309 (8th Cir. 1987); *Spear v. Sowders*, 71 F.3d 626, 633 (6th Cir. 1995) (en banc)). In so doing, the Ninth Circuit noted "the fact that contraband hidden on or inside a person would only be transferred to a prisoner through

contact with the prisoner while 'an object secreted in a car, to which prisoners may have access, is a potential threat at all times after the car enters the grounds.'" *Id.* at 984 (citing *Spear*, 71 F.3d at 633).

Here, it is undisputed that Plaintiff parked his car in the GBDF parking lot.  Pl. Decl. ¶ 5.  It is also undisputed that "[i]nmate workers at GBDF had full access to the visitor lobby and parking lot."  SGIMFID ¶ 7.  Nor does Plaintiff dispute the fact that prison officials were concerned "that contraband was coming into the facility due to visitors hiding it in the parking lot or visitor lobby bathrooms for inmate workers to find and smuggle into the jail," *id.*, or that, on the day in question, the Deputy Defendants were engaged in an enforcement operation to "contact[] as many visitors as possible before they entered the visitor lobby to make sure they were not in the possession of contraband such as drugs or weapons," *id.* ¶ 5.  Although Plaintiff disputes certain particulars as to how the operation was carried out, he also does not dispute the basic fact that the operation involved conducting a quick search of most visitors and their vehicles.  *Id.* ¶ 6.  And, while Plaintiff claims to have not been aware of the verbiage on the signs posted on Alta Road and in the GBDF parking lot, he does not dispute that the signs were present.  *Id.* ¶ 4.  He also claims to have visited GBDF "upwards of a hundred times." *Id.* ¶ 8.

Accordingly, viewing the facts and evidence in the light most favorable to Plaintiff, given the signs noting that all persons and vehicles were subject to search on the premises, Plaintiff was or should have been aware that his privacy interest in his vehicle was reduced when he entered the grounds of GBDF.  The intrusion was not significant, while the governmental interest in preventing the introduction of contraband into GBDF was great. *See Cates*, 976 F.3d at 984 (citing *Spear*, 71 F.3d at 633; *Romo v. Champion*, 46 F.3d 1013, 1019 (10th Cir. 1995)).  Plaintiff does not contend that the search of his car, which happened in a public lot, otherwise was conducted in an unreasonable manner.  Thus, the unconsented search of Plaintiff's car was not unreasonable, even after Plaintiff expressed a preference to leave.  *See Prevo*, 435 F.3d at 1348.  Accordingly, the Court **GRANTS** the / / /

Deputy Defendants' Motion as to Plaintiff's fifth cause of action for unreasonable search to the extent it is premised on the allegedly unreasonable search of Plaintiff's vehicle.[7]

***B. Search of Plaintiff's Person***

Plaintiff also contends that the Deputy Defendants' search of his person was unreasonable. TAC ¶¶ 139–41. Plaintiff appears to contend the search was unreasonable because he had indicated his desire to go home rather than proceed with the visit, *see* Opp'n at 6, but the Deputy Defendants nonetheless used force in subjecting him to an unconsented search of his person, *see id.* at 9–10. The Deputy Defendants, on the other hand, argue that their search of Plaintiff was reasonable pursuant to the administrative search exception because "an individual who consents to a search by entering jail grounds does not retain the right to forego the visit in lieu of being searched." MSJ at 9. The Deputy Defendants also contend that "Deputy Shea had no involvement with the initial attempt to search Plaintiff, and should be dismissed from Plaintiff's unreasonable search claims as a matter of law." MSJ at 8 (citing *Felarca v. Birgeneau*, 891 F.3d 809, 820 (9th Cir. 2018)).

As to the argument that Deputy Shea had no involvement with the search of Plaintiff's person, the Court finds that a reasonable jury could conclude otherwise. Viewing the evidence in Plaintiff's favor, while Deputy Shea may not have been involved in the initial questioning of Plaintiff, he was involved in the attempts to gain physical control over Plaintiff and arrest him that necessarily preceded the forcible search of Plaintiff's person. Accordingly, a reasonable jury could find that Deputy Shea was an integral participant in the search of Plaintiff's person such that he can be held liable. *See Nicholson v. City of Los Angeles*, 935 F.3d 685, 691 (9th Cir. 2019) (holding, under integral participation theory, "liability may attach if the officer has 'some fundamental involvement in the conduct that allegedly caused the violation'") (citations omitted).

---

[7] Alternatively, the Deputy Defendants are entitled to qualified immunity on this claim. Given the existence of out-of-circuit authority sanctioning similar searches and the Ninth Circuit's acknowledgement of those cases, without outright rejecting them, in *Cates*, the Court cannot find as a matter of law that every reasonable official would have understood that the search of Plaintiff's vehicle was unlawful such that any constitutional violation was clearly established.

Further, viewing the evidence in the light most favorable to Plaintiff and construing all reasonable inferences in his favor, the Court cannot find as a matter of law that no jury would consider the search of Plaintiff's person unreasonable. As noted *supra*, the government has an undeniably strong interest in keeping contraband out of penological institutions. Nonetheless, that interest must be balanced against the intrusion on Plaintiff's Fourth Amendment rights. The Ninth Circuit has made clear that "[p]at-down searches and metal detector screenings of visitors may be conducted as a prerequisite to visitation without any individualized suspicion, given the weighty institutional safety concerns," because "[s]uch searches are 'relatively inoffensive' and 'less intrusive than alternative methods,' and they may be avoided by the simple expedient of not visiting the prison." *Cates*, 976 F.3d at 979–80 (citing *McMorris*, 567 F.2d at 899). The search of Plaintiff, however, was neither "relatively inoffensive" nor "less intrusive than alternative methods," such as simply allowing Plaintiff to depart rather than going "hands on" and physically forcing him to submit to a search after handcuffing him.

The Deputy Defendants argue that the Ninth Circuit's holdings in *Cates* and *Aukai* support their position that Plaintiff could not choose to forgo the visit in lieu of being searched. MSJ at 9–10. The Court, however, disagrees. In *Cates*, the Ninth Circuit held that it was unreasonable to force a prison visitor to submit to a strip search in lieu of letting the visitor forgo the visit, but it recognized that, "[i]n other circumstances or settings, a refusal to allow someone to depart rather than submit to a search may be justified by legitimate security needs." 976 F.3d at 983. As an example, the Ninth Circuit cited its en banc decision in *Aukai*, which held "that a would-be airplane passenger could be subjected to a pat-down, empty-your-pockets search once he had entered the security area, even though he expressed a desire to leave rather than be subjected to the search." *Id.* (citing *Aukai*, 497 F.3d at 960).

Here, the intrusion was more significant. Plaintiff was subjected to more than a "pat-down, empty-your-pockets search," given that officers had to apply force and handcuff him in order to conduct their search. Moreover, the Ninth Circuit noted in *Cates* that "prisons

are not faced with the same sort of security threats as airports," given that "a terrorist is intent on bringing down an airplane—any large passenger airplane—and needs to find a soft spot at only one airport—any significant airport—to do enormous damage." *Id.* "By contrast, a prison visitor intent on bringing contraband into a prison is typically interested in bringing contraband to a particular person or group of people in *that* prison." *Id.* (emphasis in original).  Thus, the Court finds the instant situation distinguishable from the airport screening at issue in *Aukai*.  Given Plaintiff's stated desire to leave rather than proceed with the visit, the Court cannot find that using force to detain Plaintiff and search him was reasonable when balanced against the government's interests.

The Deputy Defendants alternatively contend that they had independent reasonable suspicion to further investigate and search Plaintiff given that Plaintiff's eyes were bloodshot and watery and his speech slurred, Plaintiff's admission that he had been previously arrested for "street crimes" like "gang banging," and Plaintiff's refusal to allow the deputies to search him.  MSJ at 11–12.  The Deputy Defendants premise this argument on their need (1) to "further investigate Plaintiff before he entered the jail lobby" given that "Plaintiff's eyes were bloodshot and watery and his speech slurred" and "individuals who are under the influence of alcohol or drugs are unpredictable and it would be dangerous for him to enter a secure facility," *see* MSJ at 12 (citations omitted); (2) "to ensure Plaintiff's presence on jail grounds did not violate Cal. Penal Code 4571" given Plaintiff's representation that he had previously been arrested for "gang banging," *id.* (citations omitted); and (3) "to detain Plaintiff and conduct a further investigation to see if he was hiding contraband" in light of his appearing intoxicated and telling deputies "he had a criminal history" on prison grounds, "all prior to his refusal to be searched," particularly given "the willingness of the other visitors to be searched," *id.* (citations omitted).

First, the Court is concerned that the Deputy Defendants' argument misses the mark. The Deputy Defendants appear to be premising this alternative theory on the basis that they engaged in an investigative *Terry* stop of Plaintiff.  *See* MSJ at 11 (citing *Terry v. Ohio*, 392 U.S. 1, 27 (1968)).  "To initiate a brief stop to investigate potential criminal activity, a

stop that does not rise to the level of an arrest, an officer must have reasonable suspicion to believe 'criminal activity may be afoot.'" *Thomas v. Dillard*, 818 F.3d 864, 874 (9th Cir. 2016), *as amended* (May 5, 2016) (citing *Terry*, 392 U.S. at 30; *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). "This means the officer must have reasonable suspicion 'the person apprehended is committing or has committed a criminal offense.'" *Id.* at 874–75 (citing *Arizona v. Johnson*, 555 U.S. at 326 (2009)).

"However, *Terry* does not authorize the search that occurred here," because "the only type of 'search' in this situation that can lawfully be based upon 'reasonable suspicion' (rather than 'probable cause') is a 'frisk' for weapons under *Terry*." *Cathey v. City of Vallejo*, No. 214CV01749JAMACPS, 2016 WL 3549475, at *6 (E.D. Cal. June 30, 2016), *report and recommendation adopted*, No. 214CV1749JAMACPS, 2016 WL 4494503 (E.D. Cal. Aug. 25, 2016). The Deputy Defendants do not claim they were searching Plaintiff for weapons to ensure their own safety, and accordingly the Deputy Defendants needed probable cause to engage in "a full-blown search of plaintiff that was 'aimed at detect[ing] evidence of ordinary criminal wrongdoing.'" *Id.* at *7 (citations omitted).

Even overlooking this fatal flaw in the Deputy Defendants' argument and viewing the evidence and the reasonable inferences therefrom in the light most favorable to Plaintiff, the Court cannot find that the Deputy Defendants, as a matter of law, had reasonable suspicion to further investigate and search Plaintiff. As to the first justification, Plaintiff has submitted evidence in the form of his deposition testimony and his sworn declaration that it was too dark for the Deputy Defendants to determine that he had bloodshot or watery eyes, and, at any rate, Plaintiff's evidence is that he had stated that he intended to leave rather than proceed with the visit, thus negating the need to assess his level of danger before allowing him to enter the detention facility proper. As to the Deputy Defendants' second justification, although California Penal Code section 4571 provides that "[e]very person who, having been previously convicted of a felony and confined in any State prison in this State, without the consent of the warden or other officer in charge

of any State prison . . . , comes upon the grounds of any such institution, or lands belonging or adjacent thereto, is guilty of a felony," that Plaintiff admittedly was arrested for "street crime" does not necessarily mean that Plaintiff was a convicted felon previously confined to prison such that he falls within the scope of California Penal Code section 4571.  A jury reasonably could conclude that Plaintiff's statement was inadequate, without further probing by the Deputy Defendants, to create a reasonable suspicion that Plaintiff's presence in the GBDF parking lot was a violation of section 4571.  Finally, in light of the foregoing, a reasonable jury also could find that the Deputy Defendants did not have reasonable suspicion to search Plaintiff's person for contraband.  Accordingly, the disputed issues of material fact preclude the Court from determining as a matter of law that the Deputy Defendants had reasonable suspicion (much less probable cause) to investigate and search Plaintiff.  *See, e.g.*, *Smith v. City & Cty. of Los Angeles*, No. 2:20-CV-03118-RGK-E, 2021 WL 4812320, at *6 (C.D. Cal. May 25, 2021) (finding reasonable jury could conclude that police violated Plaintiff's Fourth Amendment rights due to lack of reasonable suspicion).

Nonetheless, the Deputy Defendants also contend they are entitled to qualified immunity, so the Court's analysis does not stop here.  In his Opposition, Plaintiff asserts that "[t]here is no question that the Fourth Amendment rights at issue herein are clearly established," Opp'n at 26, including "[t]he right to be free from an arrest without probable cause," *id.* (citing *McKenzie v. Lamb*, 738 F.2d 1005, 1007 (9th Cir. 1984); *Palmer v. Sanderson*, 9 F.3d 1433, 1436–37 (9th Cir. 1993); *Harper v. City of Los Angeles*, 533 F.3d 1010, 1022 (9th Cir. 2008)).  The Deputy Defendants, however, argue that they are entitled to qualified immunity not only because "Plaintiff failed to identify a case placing Deputy Defendants on notice that they did not have the requisite level of suspicion," Reply at 7 (citing *Camarillo v. McCarthy*, 998 F.2d 638, 639 (9th Cir. 1993)), but further because, "[e]ven if this Court accepts Plaintiff's version of events as true- that he wanted to leave and was prevented from doing so- *Cates* articulates that prior to September 25, 2020- no case existed to place deputies on notice that jail visitors should be allowed to leave before

/ / /

being subjected to a search," and the strip search at issue in *Cates* was far more intrusive than the search at issue here, *id.* at 6–7 (citing *Cates*, 976 F.3d at 985).

The Court agrees with the Deputy Defendants that, in light of the Ninth Circuit's statements in *Cates*, the law does not appear to have been clearly established as of May 2016 that a visitor to a prison must be permitted to leave and forgo an intended visit rather than submit to a search. *See* 976 F.3d at 985 (finding prison official who conducted strip search was entitled to qualified immunity because, "prior to our decision in this case [in 2020], there has been no controlling precedent in this circuit, or a sufficiently robust consensus of persuasive authority in other circuits, holding that prior to a strip search a prison visitor—even a visitor as to whom there is reasonable suspicion—must be given an opportunity to leave the prison rather than be subjected to the strip search"). Accordingly, the Court finds that the Deputy Defendants are entitled to qualified immunity for their search of Plaintiff's person and **GRANTS** the Deputy Defendants' Motion as to that portion of Plaintiff's fifth cause of action.

## III. Unreasonable Seizure of Person/Excessive Force

As an initial matter, although most of Plaintiff's allegations in the TAC and his first cause of action relate to the Deputy Defendants' alleged use of excessive force, Plaintiff also titles his first cause of action "unreasonable seizure of person." *See* TAC at 18. Plaintiff also alleges, albeit not in detail, that the acts of the Deputy Defendants "violated [Plaintiff]'s Constitutional right(s) to be free from unreasonable seizure and/or free from excessive force." *Id.* ¶ 73. In his opposition, Plaintiff argues that he was subject to a "false arrest" by the Deputy Defendants. *See, e.g.*, Opp'n at 26.

In their Reply, the Deputy Defendants claim that Plaintiff "has not asserted a claim in this lawsuit for false arrest," because, "[w]ithin a complaint, each claim based upon a separate transaction or occurrence needs to be 'stated in a separate count.'" Reply at 3 (quoting *Bautista v. Los Angeles Cty.*, 216 F.3d 837, 840 (9th Cir. 2000)). They further argue that "[r]eading an unlawful arrest claim into the TAC is also prejudicial to the Deputy Defendants," given that the claim is not pled. *See id.* at 3 n.4.

The Court, however, disagrees with the Deputy Defendants that Plaintiff has not asserted a claim for unreasonable seizure of his person.  Although Plaintiff's pro se TAC is not a model of clarity, Plaintiff's SAC contained only a claim for excessive force.  *See* SAC at 1 (titling first claim "Excessive Force"); *id.* ¶¶ 28–38 (allegations focused solely on excessive force).  The TAC, meanwhile, expanded that claim to include "Unreasonable Seizure of Person" as well.  And, in dismissing a portion of the TAC's fourth cause of action, the Court reasoned that such was proper "[g]iven that Plaintiff already alleges a cause of action for unreasonable seizure of his person and excessive force," rendering the claim of unreasonable seizure of his person contained in the fourth cause of action "duplicative."  *See* ECF No. 71 at 14.  The fourth cause of action claims that "there was insufficient evidence to seize, arrest and confine, incarcerate [Plaintiff]."  TAC ¶ 125.  Liberally construed, the claim alleges an unlawful arrest in violation of section 1983.  Finally, the pleading of a single cause of action for both unreasonable seizure and excessive force is not without precedent, even for plaintiffs represented by counsel.  *See, e.g.*, *Williams v. City of Merced*, No. 1:10-CV-01999-MJS, 2013 WL 498854, at *1 (E.D. Cal. Feb. 7, 2013).  Here, both the force and the seizure were part of the same "transaction or occurrence," and therefore need not have been pleaded separately.  Accordingly, the Court finds that Plaintiff has asserted claims for both unreasonable seizure of his person/unlawful arrest and excessive force.

Given that the Deputy Defendants' position is that Plaintiff failed to assert a claim for unlawful arrest, the Deputy Defendants did not carry their burden of production as to Plaintiff's claim for unreasonable seizure of his person/unlawful arrest.  *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000) ("If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial.  In such a case, the nonmoving party may defeat the motion for summary judgment without producing anything.") (citations omitted).  Accordingly, the Court does not analyze the portion of Plaintiff's first cause of action premised on

unreasonable seizure of his person and instead proceeds to Plaintiff's claim for excessive force, which the Deputy Defendants' MSJ does contest.[8]

Claims of excessive force are analyzed under the Fourth Amendment prohibition against unreasonable seizures. *See Graham*, 490 U.S. at 394. To state an excessive force claim, a plaintiff must allege facts showing that the defendant's conduct was "objectively unreasonable in light of the facts and circumstances confronting them." *Id.* at 397. In determining the reasonableness of an officer's conduct, the court must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests" against the "countervailing government interests at stake." *Id.* at 396. Courts should consider the "facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396 (citing *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)). "These factors, however, are not exclusive. Rather, we examine the totality of the circumstances and consider 'whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham.*'" *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (quoting *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994)).

"'Because [the excessive force inquiry] nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, [the Ninth Circuit] ha[s] held on many occasions that summary judgment . . . in excessive force cases should be granted sparingly.' This is because such cases almost always turn on a jury's credibility

---

[8] Nonetheless, the Court finds the Deputy Defendants' confusion as to the scope of Plaintiff's first cause of action reasonable given the paucity of the allegations in the TAC on this point. Accordingly, the Court *sua sponte* **GRANTS** the Deputy Defendants leave to file a supplemental motion for summary judgment on this limited ground. *See, e.g.*, *Jin v. Rodriguez*, No. CVF045894 REC/LJO P, 2006 WL 657098, at *1 (E.D. Cal. Mar. 15, 2006) ("Although the court could conclude that defendants waived this issue by failing to raise it [in their motion for summary judgment], the court will not do so here given the potentially dispositive nature of this ground for summary judgment. Nonetheless, the court concludes that the issue cannot be resolved at this juncture because plaintiff will not have had an adequate opportunity to respond. The court will allow defendants to file a supplemental motion for summary judgment on the ground.").

determinations." *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (citing *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002); *Liston v. Cty. of Riverside*, 120 F.3d 965, 976 n.10 (9th Cir. 1997) (as amended)) (first alteration in original).

In the TAC, Plaintiff claims that the Deputy Defendants used "unnecessary and excessive force" against him "when they grabbed, slammed, choked, twisted, and handcuffed Stroud." TAC ¶ 64. The Deputy Defendants argue that Sergeant Michalke should be dismissed from the claim because he was not involved in the force that culminated in Plaintiff's arrest. MSJ at 16 (citations omitted). They further claim that the "minimal" force used by Deputies Shea and Lizarraga was reasonable given Plaintiff's alleged resistance. *Id.* at 17. To the extent Plaintiff's claim is premised on allegedly overtight handcuffing, the Deputy Defendants argue that the claim fails as a matter of law due to Plaintiff's failure to inform the Deputy Defendants that the handcuffs were too tight. *Id.* at 18. At any rate, the Deputy Defendants claim they are entitled to qualified immunity because no clearly established law placed them on notice that the quantum of force they used in handcuffing a potentially intoxicated jail visitor constituted excessive force. *See id.* at 24–25 (citations omitted).

***A. Sergeant Michalke***

The Court agrees that Plaintiff has failed to raise an issue of material fact as to Sergeant Michalke's personal participation in Plaintiff's arrest. Although Sergeant Michalke grabbed Plaintiff's arm to escort him to a nearby vehicle to effectuate the search of his person, Deputy Shea took over for him "[w]ithin seconds." Michalke Decl. ¶ 9. Sergeant Michalke then stood nearby and directed any other visitors away from the area while Deputies Lizarraga and Shea handcuffed and searched Plaintiff. *Id.* ¶ 11. Plaintiff presents no evidence to the contrary. Accordingly, to the extent Plaintiff's claim is premised on Sergeant Michalke's personal participation in his handcuffing and arrest, the Deputy Defendants' MSJ must be granted, as the mere grabbing of Plaintiff's arm does not rise to the level of excessive force. *Harmon v. City of Pocatello*, 854 F. App'x 850, 853

/ / /

(9th Cir. 2021) (finding that officer's grabbing of arm to initiate arrest was minimal and objectively reasonable use of force).

However, Plaintiff further claims that Sergeant Michalke should be held liable based on his alleged failure to intervene, as each of the Deputy Defendants "w[as] obligated to prevent Mr. Stroud's false arrest and had the opportunity to do so" and should have "intervene[d] and prevent[ed] this arrest." Opp'n at 24–25. Plaintiff claims that this is particularly true of Sergeant Michalke, who "was a supervisor." *Id.* at 25. Plaintiff claims that whether there was an opportunity to intervene is generally a question of fact for the jury to decide. *Id.* (citations omitted).[9]

While it is true that "police officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen . . . if they had an opportunity to intercede," *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000), *as amended* (Oct. 31, 2000) (citations and internal quotation marks omitted), the Ninth Circuit has recently stated that "[o]ur precedent does not clearly establish when an officer has a 'realistic opportunity to intercede,'" *Penaloza v. City of Rialto*, 836 F. App'x 547, 549 (9th Cir. 2020). Thus, regardless of whether Sergeant Michalke violated Plaintiff's constitutional rights by failing to intervene in Plaintiff's handcuffing and arrest, Plaintiff has not met his burden of showing that the law clearly establishes when an officer has such a duty to intervene. Accordingly, the Court finds that Sergeant Michalke is entitled to

/ / /

[9] The Deputy Defendants also claim that "Plaintiff has not alleged a separate failure to intervene claim and no facts alleging a failure to intervene are included in the TAC." Reply at 3 n.2 (citations omitted). They further claim that "any failure to intervene allegations in the TAC are directed at Doe Defendants or Deputies Kirsten Racine and Mark Snelling who were dismissed with prejudice." *Id.* (citations omitted). The Court, however, respectfully disagrees. Plaintiff need not allege Sergeant Michalke's liability for failure to intervene as a separate claim. *See, e.g.*, *Hicks v. City of Vallejo*, No. 2:14-CV-0669 DAD PS, 2015 WL 3403020, at *4 (E.D. Cal. May 27, 2015) (analyzing officer's alleged failure to intercede as part of excessive force claim). Further, Plaintiff clearly alleges that "each and every individual named defendant[]," which would include Sergeant Michalke, "had a duty to intervene . . . to prevent the use of excessive force by any fellow officer," "had a reasonable opportunity to intervene," and nonetheless "failed and/or declined to intervene." TAC ¶ 73. Accordingly, the Court finds that Plaintiff does assert an excessive force claim against Sergeant Michalke based on his alleged failure to intervene.

qualified immunity as to Plaintiff's excessive force claim and **GRANTS** the MSJ on this ground as to him.

***B. Deputies Shea and Lizarraga***

That brings us to Deputies Shea and Lizarraga. Viewing the evidence and drawing all inferences in the light most favorable to Plaintiff, after Plaintiff refused to submit to a search of his vehicle and person and indicated he would prefer to leave than to continue with his visit: (1) they both grabbed Plaintiff's arms (*see* Pl. Decl. ¶ 8; Shea Decl. ¶ 10; Lizarraga Decl. ¶ 10); (2) they both slammed Plaintiff against the back of a parked car (*see* Pl. Decl. ¶ 8; Shea Decl. ¶ 12); (3) Deputy Lizarraga wrapped his arm around Plaintiff's neck and shoulders (*see* Pl. Decl. ¶ 8); (4) Deputy Shea twisted Plaintiff's arm and bent his wrist uncomfortably (*see* Pl. Decl. ¶ 8; Shea Decl. ¶ 14); (5) Deputy Shea grabbed Plaintiff's head and pulled him to the ground, while Deputy Lizarraga "used [his] body weight to assist Deputy Shea" (*see* Pl. Decl. ¶ 8; Shea Decl. ¶ 15; Lizarraga Decl. ¶ 13); (6) Deputy Shea applied pressure to Plaintiff's upper back and Deputy Lizarraga put his knee on Plaintiff's upper back while Plaintiff was prone on the ground (*see* Shea Decl. ¶ 16; Lizarraga Decl. ¶ 13); and (7) Deputy Lizarraga tightly handcuffed Plaintiff and wrenched the handcuffs down (*see* Pl.'s Depo Tr. 83:22–24).[10] Plaintiff did not attempt to flee, although he may have tensed up as an unconscious reflex in light of the force being applied to him. Pl.'s Depo. Tr. 79:17–19. Plaintiff claims his hands stayed behind him throughout the confrontation. *Id.* 82:5–6. He also claims to have told the Deputy Defendants collectively that his handcuffs were overly tight and asked to have them loosened. *Id*. 92:1–16.

The Deputy Defendants claim that "Deputies Shea and Lizarraga used the minimal amount of force necessary to handcuff Plaintiff in response to his active resistance in the parking lot of a jail." MSJ at 17. However, viewing the disputed evidence in the light most

---

[10] Although Plaintiff conclusorily claims to have been choked during the confrontation, *see, e.g.*, Pl.'s Depo. Tr. 79:1–14, he provides no particulars concerning this allegation; accordingly, the Court disregards this fact in its analysis.

favorable to Plaintiff, a reasonable jury could find that Plaintiff was not resisting the Deputy Defendants. The Deputy Defendants further argue that, to the extent Plaintiff's claim is premised on Deputy Lizarraga's allegedly overtight cuffing of Plaintiff, "the Deputy Defendants never had knowledge that the handcuffs were tight." *Id.* at 18 (citations omitted). Again, viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could conclude otherwise, given Plaintiff's deposition testimony that he did inform the Deputy Defendants of the fact that his handcuffs were too tight and asked them to loosen the handcuffs to no effect.[11]

The Court concludes that, viewing the evidence and reasonable inferences therefrom in the light most favorable to Plaintiff as the nonmovant, a reasonable jury could find that Deputies Shea and Lizarraga used excessive force against Plaintiff. Regarding the nature and quality of the intrusion, while perhaps not the most significant, it was not minimal, either. *See, e.g.*, *Roberson v. City of Hawthorne*, 516 F. Supp. 3d 1033, 1044 (C.D. Cal. 2021) ("[T]he nature of the intrusion involved placing [the plaintiff] in a headlock, throwing him against the wall and then to the ground, and then putting weight on his neck, with [another officer] adding weight to [the plaintiff's] lower backside. Defendants emphasize that the whole scuffle took only a few seconds and that [the plaintiff] did not suffer any immediate apparent injuries. But a violent tackle, especially focused on the head and neck area, need not take long to be severe. Nor does the fact that [the plaintiff] appeared to emerge relatively unscathed change the nature of the attack that he described."); *Onyenwe v. City of Corona*, No. CV1201363MMMSPX, 2013 WL 12169375, at *17 (C.D. Cal. Dec. 1, 2013) (finding genuine issues of material fact

[11] In their Reply, the Deputy Defendants argue for the first time that Plaintiff "failed to offer any evidence that he was critically injured by the Deputy's attempts' [sic] to handcuff him." Reply at 8 (citing *Arpin v. Santa Clara Transp. Agency*, 261 F.3d 912, 922 (9th Cir. 2001)). They also posit for the first time that "Plaintiff's excessive force allegations are conclusory and not sufficiently detailed to determine which of the Deputy Defendants is being accused on which acts." Reply at 7. The Court declines to address these arguments, as "arguments raised for the first time in a reply brief are waived." *Graves v. Arpaio*, 623 F.3d 1043, 1048 (9th Cir. 2010) (per curiam) (citing *United States ex rel. Meyer v. Horizon Health Corp.*, 565 F.3d 1195, 1199 n.1 (9th Cir. 2009)).

precluded summary judgment in favor of officers on excessive force claim where the plaintiff alleged he was grabbed by his arm, yanked from his car, slammed against the car, kicked, and handcuffed), *aff'd*, 637 F. App'x 370 (9th Cir. 2016); *Palmer*, 9 F.3d at 1436 (finding that overly tight handcuffing and refusal to loosen handcuffs after the arrestee complains of pain could be excessive force).

Meanwhile, the crimes at issue here were decidedly not severe. *See, e.g.*, *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1091 (9th Cir. 2013) (concluding that alleged crime of obstructing a police officer "was far from severe") (citations omitted); *Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001) (describing obstruction of a police officer as a "relatively minor crime"); "[D]isorderly conduct via public intoxication does not constitute a 'severe crime.'" *McDonald v. Cty. of Sonoma*, No. 20-CV-04183-CRB, 2020 WL 7319400 (N.D. Cal. Dec. 11, 2020) (citing *Santos*, 287 F.3d at 854); *Westerfield v. Wade*, No. CV05-6645 ABC (CWX), 2008 WL 1931240, at *2 (C.D. Cal. Apr. 9, 2008) ("The severity of the crime factor also supports Plaintiff, as public intoxication and/or resisting, delaying or obstructing a police officer in the manner asserted by Defendant, are not serious crimes."); *A.C. v. City of Santa Clara*, No. 13-CV-03276-HSG, 2015 WL 5350412, at *7 (N.D. Cal. Sept. 14, 2015) (similar).

Further, a jury viewing the evidence in Plaintiff's favor could conclude that the threat posed by Plaintiff—the most important of the *Graham* factors, *see Roberson*, 2021 WL 852124, at *8 (citing *Smith*, 394 F.3d at 702)—was minimal to nonexistent. Although the Deputy Defendants contend that they "needed to handcuff and search Plaintiff for the safety of the deputies, other visitors, and inmates," MSJ at 17 (citing SUF ¶ 22), "a simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern," *Deorle*, 272 F.3d at 1281. Here, the objective factors do not suggest that Plaintiff posed a threat to anyone given that Plaintiff had expressed a desire to leave and go home rather than proceed with his visit to the secure facility. Although the Deputy Defendants did not know for certain whether Plaintiff was in possession of any weapons, SUF ¶¶ 22, 25, they do not contend that

Plaintiff was acting erratically or otherwise showing objective indications that he might turn violent should they allow him to leave as he requested. They only contend Plaintiff began displaying "pre-assaultive indicators" once they went "hands-on" with Plaintiff and refused to allow him to leave. *See, e.g.*, MSJ at 17 (citing SUF ¶¶ 19–21). Even an intended prison visitor carrying contraband—which, it turned out, Plaintiff was not—cannot pose an "immediate" threat to prison security if he ultimately leaves before entering the secure facility.

Finally, a reasonable jury could conclude that Plaintiff did not meaningfully resist the Deputy Defendants. Although Plaintiff did not comply with the Deputy Defendants' request that he submit to a search of his person and his car, viewing the evidence in the light most favorable to Plaintiff, "[Plaintiff] never became hostile or aggressive towards the[ Deputy Defendants], never took a fighting stance, never clenched his fists or made threatening gestures, and he never used profanity." *Lee v. City of San Diego*, 492 F. Supp. 3d 1088, 1102 (S.D. Cal. 2020). Plaintiff presents evidence that he did not at any point attempt to flee and that any resistance he offered was, at most, unintentional and minimal. Pl.'s Depo. Tr. 79:17–19, 82:5–6. While the Deputy Defendants contend that Plaintiff appeared intoxicated, viewed in Plaintiff's favor, the evidence reasonably could be interpreted otherwise, and, as noted above, Plaintiff did not engage in any "pre-assaultive indicators" until the Deputy Defendants had already begun attempting to physically detain him.

In sum, although the government has an undeniable interest in maintaining prison security and preventing the introduction of weapons and contraband into a secure facility, assessing the totality of the circumstances in the light most favorable to Plaintiff, a reasonable jury legitimately could conclude that the force used here was excessive when balanced against that interest. Accordingly, the Court cannot conclude, as a matter of law, that Deputies Shea and Lizarraga did not use excessive force against Plaintiff.

Again, this does not conclude the Court's analysis, as Deputies Shea and Lizarraga contend that they are entitled to qualified immunity on Plaintiff's excessive force claim.

Specifically, they argue that "Plaintiff will also be unable to provide specific case law placing Deputy Shea and Deputy Lizarraga on notice that handcuffing an assaultive and potentially intoxicated individual on the grounds of a detention facility amounts to excessive force." MSJ at 24–25. However, "[i]t was clearly established at the time of [Plaintiff]'s arrest that slamming a non-resisting arrestee against a car constitutes an excessive use of force." *Onyenwe*, 2013 WL 12169375, at *17 (citing *Jackson v. Pittsburg*, No. C 09–01016 WHA, 2010 WL 2347085, *7 (N.D. Cal. June 8, 2010); *Silva v. City of San Leandro*, 744 F. Supp. 2d 1036, 1054 (N.D. Cal. Sept. 29, 2010)), *aff'd*, 637 F. App'x 370 (9th Cir. 2016). Further, it was clearly established at the time of the incident that overly tight handcuffing and refusal to loosen handcuffs after the arrestee complains of pain could be excessive force. *See, e.g.*, *Palmer*, 9 F.3d at 1436. Thus, viewing the evidence in the light most favorable to Plaintiff, the Court finds that Deputies Shea and Lizarraga are not entitled to qualified immunity as a matter of law on Plaintiff's excessive force claim.

Accordingly, the Court **DENIES** the Deputy Defendants' Motion as to Plaintiff's excessive force claim as to Deputies Shea and Lizarraga.

## IV.   Retaliation

Finally, Plaintiff claims that he "has a First Amendment right to ask questions of the police for engaging in what he perceived to be a violation of his rights," and that the Deputy Defendants "used force on the arrested Stroud because Stroud asked to go home and did not comply with the officers orders [sic]." TAC ¶¶ 80, 84. He argues that the Deputy Defendants "became irate with him for asking questions thus they over reacted to the situation and used excessive force to punish Stroud for asserting his Constitutional Right." *Id.* ¶ 84. It appears Plaintiff is asserting that the Deputy Defendants' use of force against, search of, and arrest of him all constituted retaliation. *See id.* ¶ 87; *see also* MSJ at 18–19 (arguing "Plaintiff cannot establish that a retaliatory motive led to his arrest or the search of him and his vehicle").

/ / /

To present a valid claim for First Amendment retaliation, Plaintiff must establish "that (1) [he] engaged in constitutionally protected activity; (2) the defendant's actions would 'chill a person of ordinary firmness' from continuing to engage in the protected activity; and (3) the protected activity was a substantial motivating factor in the defendant's conduct—i.e., that there was a nexus between the defendant's actions and an intent to chill speech." *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 867 (9th Cir. 2016). If probable cause for an arrest exists, then a retaliatory arrest claim fails as a matter of law. *See Nieves v. Bartlett*, 139 S. Ct. 1715, 1728 (2019).

The Deputy Defendants claim entitlement to judgment in their favor on this claim based on a failure of proof as to the third element, given that (1) they intended to search Plaintiff even before he exercised his First Amendment rights, and (2) their motive was not retaliatory, but rather to prevent the introduction of contraband into GBDF.  MSJ at 19. Further, they contend that Plaintiff was arrested for public intoxication and resisting arrest, not due to his refusal to submit to a search.  *Id.*  Finally, the Deputy Defendants argue that, in the prison context, the advancement of a legitimate correctional goal—i.e., preventing contraband in the prison—is a factor that weighs in their favor.  *Id.* (citing *Rhodes v. Robinson*, 408 F.3d 559, 567–68 (9th Cir. 2005); *Hines v. Gomez*, 108 F.3d 265, 267 (9th Cir. 1997)).  The Deputy Defendants ultimately contend that Plaintiff fails to put forth any evidence of a retaliatory motive other than his subjective belief that he was retaliated against for his refusal to submit to a search, and that this is fatal to his claim.  Reply at 10 (citing *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1028 (9th Cir. 2001)).[12]

---

[12] In one sentence in a footnote of their MSJ, the Deputy Defendants also assert, without elaboration, that they are "separately entitled to judgment on this claim because Plaintiff cannot prove that his arrest was without probable cause."  MSJ at 20 n.4 (citations omitted).  "Arguments raised only in footnotes, or only on reply, are generally deemed waived.  [The Court] therefore decline[s] to address this argument."  *Est. of Saunders v. Comm'r*, 745 F.3d 953, 962 (9th Cir. 2014) (citing *City of Emeryville v. Robinson*, 621 F.3d 1251, 1262 n.10 (9th Cir. 2010); *Graves*, 623 F.3d at 1048).  Further, given the Deputy Defendants' position that Plaintiff does not assert a claim for unlawful arrest, the issue of probable cause to arrest Plaintiff was not briefed by the Parties.  Accordingly, the Court finds it inappropriate to address this inadequately raised argument.

It is true that a plaintiff's subjective belief that he was retaliated against, without any corroborating statement by any third party or other evidence, is insufficient evidence of retaliation. *See Carmen*, 237 F.3d at 1028; *see also Wilborn v. Ashcroft*, 222 F. Supp. 2d 1192, 1212 (S.D. Cal. 2002) (granting motion for summary judgment on retaliation claim where "plaintiff fails to produce any evidence in support of his assertion that defendant retaliated against him. Plaintiff's statement in his deposition that he believes defendant retaliated against him, without any basis in personal knowledge or reference to any evidence, is insufficient to withstand summary judgment") (citing *Carmen*, 237 F.3d at 1028), *aff'd*, 70 F. App'x 469 (9th Cir. 2003). However, "timing can properly be considered as circumstantial evidence of retaliatory intent." *Pratt v. Rowland*, 65 F.3d 802, 808 (9th Cir. 1995) (citing *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1316 (9th Cir. 1989).

Plaintiff relies on the temporal proximity of the Deputy Defendants' use of force and his refusal to submit to a search as circumstantial proof of the Deputy Defendants' retaliatory motive. *See* Opp'n at 28–29. Drawing all reasonable inferences in Plaintiff's favor and viewing the evidence in the light most favorable to him, the Court finds that a jury reasonably could infer that the Deputy Defendants went "hands on" with Plaintiff and ultimately arrested, searched, and charged him because of his refusal to comply with their requests rather than, as they contend, to prevent the introduction of contraband into a detention facility or due to his alleged commission of the crimes of public intoxication and/or resisting arrest. *See Beck v. City of Upland*, 527 F.3d 853, 868 (9th Cir. 2008) ("[The plaintiff]'s showing of a heated personal confrontation followed by a hasty arrest likewise could rationally support a finding of retaliatory animus.").

However, the Deputy Defendants further contend that they are entitled to qualified immunity on this claim because "Plaintiff will also be unable to point to controlling authority that detaining an individual in a jail parking [sic] pursuant to the administrative search exception and when reasonable suspicion exists for that detention violates any First Amendment guarantees." MSJ at 25. Plaintiff counters that the Deputy Defendants are

not entitled to qualified immunity. *See* Opp'n at 29 (citing *Smothers v. Gibson*, 778 F.2d 470 (8th Cir. 1985); *Daugherty v. Campbell*, 935 F.2d 780 (6th Cir. 1991)).

Although Plaintiff's citation to out-of-circuit authority unrelated to the First Amendment is unavailing, the Ninth Circuit nevertheless has held, in the context of a retaliatory arrest claim, that "[i]t is clearly established that a person's Fourth Amendment rights are violated if the sole basis for his arrest is his challenge to the officer's authority absent a warrant." *Gasho v. United States*, 39 F.3d 1420, 1439 (9th Cir. 1994). Accordingly, the Court concludes that, viewing the evidence in the light most favorable to Plaintiff, the Deputy Defendants are not entitled to qualified immunity as a matter of law on Plaintiff's retaliation claim. As noted, a reasonable jury could conclude that the Deputy Defendants searched and arrested Plaintiff in retaliation for his refusal to comply with their commands, and that right was well established at the time of the incident. *See Duran v. City of Douglas, Ariz.*, 904 F.2d 1372, 1378 (9th Cir. 1990) ("[T]o the extent [the Deputy Defendants] [are] found to have detained [Plaintiff] as punishment for [his First-Amendment protected invocation of his constitutional rights], we hold that [they] ought to have known that [they] w[ere] exercising [their] authority in violation of well-established constitutional rights."). Accordingly, the Court **DENIES** the Deputy Defendants' Motion as to Plaintiff's retaliation claim.

## CONCLUSION

In light of the foregoing, the Court **OVERRULES AS MOOT** the Deputy Defendants' Evidentiary Objections (ECF No. 103-1) and **GRANTS IN PART AND DENIES IN PART** the Deputy Defendants' Motion for Summary Judgment (ECF No. 86). Specifically, the Court **GRANTS** the Deputy Defendants' Motion as to Plaintiff's claim for excessive force as to Sergeant Michalke; Plaintiff's fourth cause of action for unreasonable seizure of his phone; and Plaintiff's fifth cause of action for unreasonable search of his person, belongings, and vehicle. The Court **DENIES** the Deputy Defendants' Motion as to Plaintiff's claim for excessive force as to Deputies Shea and Lizarraga and as to Plaintiff's claim for retaliation in its entirety.

As noted *supra*, the Deputy Defendants appear to have misapprehended, not without reason, the scope of Plaintiff's first cause of action, particularly Plaintiff's claim for unreasonable seizure of his person. The Court therefore **GRANTS** the Deputy Defendants leave to file a supplemental motion for summary judgment, *not to exceed ten (10) pages*, addressing only Plaintiff's claim for unreasonable seizure of his person. Should the Deputy Defendants elect to do so, they **SHALL FILE** their supplemental motion on or before April 7, 2022. Plaintiff **SHALL FILE** his opposition, *not to exceed ten (10) pages*, on or before April 21, 2022. The Deputy Defendants **SHALL FILE** their reply, if any, *not to exceed five (5) pages*, on or before April 28, 2022. Upon completion of the briefing, the Court will take the matter under submission on the papers without oral argument pursuant to Civil Local Rule 7.1(d)(1) and issue a ruling in due course.

On the other hand, should the Deputy Defendants elect not to file a supplemental motion for summary judgment, the Parties **SHALL CONFER** and **SHALL FILE** a proposed schedule of pretrial dates and deadlines within thirty (30) days of the date on which this Order is electronically docketed.

Finally, in light of the Court's partial denial of the Deputy Defendants' Motion and given that Plaintiff is proceeding *in forma pauperis*, *see* ECF No. 4, the Court will entertain a motion for appointment of counsel pursuant to 28 U.S.C. § 1915(e)(1). Should Plaintiff wish to file a motion for appointment of counsel, Plaintiff **SHALL FILE** his motion within thirty (30) days of the date on which this Order is electronically docketed. In advance of filing, Plaintiff **SHALL CONTACT** Chambers by telephone at (619) 557-5542 to obtain a hearing date for said motion.

**IT IS SO ORDERED.**

Dated: March 21, 2022

Janis L. Sammartino
Hon. Janis L. Sammartino
United States District Judge